***********
Upon review of the competent evidence of record and the briefs and oral arguments of the parties, with reference to the errors assigned, the Full Commission finds no good grounds to receive further evidence, or to rehear the parties or their representatives. Upon reconsideration of the evidence, the Full Commission, affirms with modifications, the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS *Page 2 
1. On August 28, 2007, the date of Plaintiff's work injury giving rise hereto, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On August 28, 2007, an employment relationship existed between the parties, and Defendant-Carrier provided workers' compensation insurance coverage for Defendant-Employer at relevant times during Plaintiff's employment.
3. On September 6, 2007, Defendants filed a Form 19 with the Industrial Commission.
4. On December 19, 2007, Plaintiff filed a Form 18 with the Industrial Commission.
5. Defendants contend that on August 28, 2007, Plaintiff's average weekly wage was $476.60, yielding a compensation rate of $317.75.
6. On January 4, 2008, Defendants accepted the compensability of Plaintiff's claim via a Form 60. Defendants paid Plaintiff temporary total disability compensation at the rate of $317.75 per week from October 25, 2007 through the present and continuing.
7. On July 10, 2008, Defendants filed a Form 33 to seek a determination of whether Plaintiff is entitled to any further workers' compensation benefits.
8. On July 18, 2008, Plaintiff filed a Form 33R in response to Defendants' Form 33, stating that Plaintiff is entitled to temporary total disability compensation, permanent partial disability compensation, and medical compensation.
9. The parties stipulated to the following documents being admitted into evidence as Stipulated Exhibit One:
 a. Pre-Trial Agreement;
 b. North Carolina Industrial Commission forms and filings; *Page 3 
 c. Plaintiff's medical records.
10. On June 2, 2010, the parties stipulated via written agreement to the following facts, pursuant to the request of the Full Commission at the May 4, 2010 Full Commission hearing:
 a. Plaintiff reports that she writes with her right hand and performs other activities with her left hand;
 b. Plaintiff is a high school graduate, and took some college courses.
 *********** ISSUE
The issue to be determined is whether Plaintiff is entitled to any further workers' compensation benefits.
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 47 years old, with a date of birth of December 23, 1962. Plaintiff began working for Defendant-Employer in Davie County, North Carolina in 1998 as a habilitation technician to the mentally challenged in a group home setting. Plaintiff's employment duties as a habilitation technician for Defendant-Employer included assisting residents with their activities of daily living, which involved keeping the premises clean and habitable for the residents, transferring clients to and from wheelchairs frequently, feeding clients, changing their diapers, assisting with showers and bathing and giving medication. *Page 4 
Plaintiff has a total of 16 years of experience working as a habilitation technician, and worked in this capacity until August 28, 2007.
2. On August 28, 2007, Plaintiff was standing on a chair to clean the top of a refrigerator in the group home where she worked. The chair started to move, and Plaintiff grabbed the freezer door of the refrigerator to keep from falling. The freezer door closed on Plaintiff's hand and caught her left fifth metacarpal (small finger), thereby causing it to twist and fracture. Later the same day, Plaintiff presented to Dr. Timothy Dagenhart, a family medicine physician. Radiology revealed an acute fracture of the head of the left fifth metacarpal. Dr. Dagenhart placed Plaintiff's left small finger in a cock-up wrist splint, and instructed her to elevate the left hand and use ice to minimize swelling. Dr. Dagenhart referred Plaintiff to Dr. Thomas Adam Ginn, an orthopaedist specializing in hand surgery, and restricted her to light-duty work with no use of the left hand.
3. On September 14, 2007, Plaintiff presented to Dr. Ginn, who noted the mechanism of Plaintiff's August 28, 2007 work injury, and concluded that the x-rays taken on the same day revealed an abnormality at the left fifth metacarpal head with no obvious acute fracture, although he could not rule out a fracture based upon x-rays alone. Dr. Ginn ordered a computed tomography (CT) scan of Plaintiff's left hand, without contrast. The September 26, 2007 CT scan of Plaintiff's left hand revealed soft tissue swelling with a mildly displaced, mildly comminuted and angulated fracture of the head of the left fifth metacarpal.
4. On October 2, 2007, Dr. Ginn recommended that Plaintiff work on some gentle range of motion exercises of the left hand with a hand therapist. Dr. Ginn further ordered that Plaintiff remain non-weight bearing with her left hand other than in therapy. On October 23, 2007, Plaintiff returned to Dr. Ginn and underwent another x-ray. Dr. Ginn was of the opinion *Page 5 
that the fracture was healing with callus formation and there was no mal-alignment. He also noted that Plaintiff continued to have a great deal of stiffness and pain. Dr. Ginn continued Plaintiff's left hand therapy, including aggressive stretching and strengthening exercises for 20 minutes twice a day, and continued her light-duty work restrictions.
5. As of October 25, 2007, Defendant-Employer no longer had light-duty work available within Plaintiff's restrictions. Accordingly, Defendants began paying Plaintiff temporary total disability compensation.
6. On November 27, 2007, Plaintiff returned to Dr. Ginn, at which time he noted that she continued to have swelling, pain, and stiffness. Dr. Ginn directed that Plaintiff continue her left hand therapy. On December 28, 2007, Dr. Ginn found Plaintiff to be at maximum medical improvement, gave her permanent work restrictions of no lifting, pushing, or pulling greater than 20 pounds with the left hand, and assigned her a 15 percent permanent partial disability rating of the small finger, which equaled a two percent permanent partial disability rating of the left hand. Plaintiff continued to have residual loss of motion and pain.
7. On April 15, 2008, Defendants authorized Plaintiff to see Dr. David Stanford Baker, II, an orthopaedist specializing in hand surgery, for a second opinion evaluation. Plaintiff wanted to see whether anything else could be done to alleviate the pain, swelling, and overall look of her left hand following her August 28, 2007 work injury. Dr. Baker noted that the prior x-rays made available to him revealed a healed fracture through the left distal metacarpal at the head and neck interface with minimal radial displacement, and that Plaintiff had pain and decreased function of her left hand. Dr. Baker opined that surgery would not likely change Plaintiff's left hand function, would leave scar tissue and the risks of surgery outweighed any expected benefits. Dr. Baker further opined that Plaintiff was at maximum medical *Page 6 
improvement, and assigned a permanent partial disability rating of 15 percent to the left small finger, based upon the intra-articular nature of her left fifth metacarpal fracture and the residual decreased motion.
8. Plaintiff felt there should be additional treatment that would decrease her pain level and make her left hand more functional. Plaintiff's continued pain and dissatisfaction with the treatment she received from both Dr. Ginn and Dr. Baker led her to seek another opinion, on her own, with Dr. William Stephen Furr, an orthopaedist.
9. On May 29, 2008, Plaintiff presented to Dr. Furr. He interpreted her previous x-rays as showing that she sustained a mal-union fracture of the left fifth metacarpal. This diagnosis was confirmed by a subsequent MRI. He felt that the next step for treatment would be an osteotomy to correct the mal-union.
10. On October 16, 2008, Plaintiff underwent an osteotomy of the left fifth metacarpal performed by Dr. Furr, which included correction of the partially mal-rotated left fifth metacarpal fracture with two pins. On October 27, 2008, Plaintiff returned to Dr. Furr, who noted that she was doing well post-operatively and that x-rays revealed good positioning.
11. On November 11, 2008, Dr. Furr determined that Plaintiff's internal fixators would not be ready for removal for two weeks. On December 1, 2008, Dr. Furr removed Plaintiff's pins. The rotation of the fracture looked good, and Plaintiff began occupational therapy. On December 15, 2008, Dr. Furr's physical examination of Plaintiff revealed minimal motion in the left fifth phalange. Dr. Furr wrote a prescription for a Dynasplint, MCP flexion, and more aggressive therapy. Because Plaintiff's treatment with Dr. Furr was unauthorized, Defendants did not pay for the treatment, including the osteotomy, therapy, and prescriptions. Plaintiff was unable to obtain the Dynasplint to assist in her flexion. *Page 7 
12. On January 20, 2009, Dr. Furr noted improvement with Plaintiff's therapy; however, she still had numbness on the medial side of her left hand, continued internal rotation, and less than full extension. Dr. Furr ordered that Plaintiff continue her therapy, and use of her splints. On February 11, 2009, Dr. Furr noted that Plaintiff was "scarred down" secondary to not moving the left finger/hand due to her concern that she would shift the fracture. Plaintiff could not flex past 45 degrees. Dr. Furr was of the opinion that Plaintiff did not have a mal-union or mal-rotation at this time, but that tendon scarring and lateral subluxation was causing her to appear to have more rotation. Dr. Furr recommended that Plaintiff see Dr. Baker again to further evaluate her hand.
13. On February 24, 2009, Plaintiff returned to Dr. Furr, at which time he noted that she continued to have scar tissue. Dr. Furr recommended tenolysis and gentle manipulation of her left hand to obtain more range of motion. Defendants would not approve these procedures.
14. On June 3, 2009, Dr. Furr felt that Plaintiff was not at maximum medical improvement. Dr. Furr continued to recommend that Plaintiff undergo additional therapy, see a hand specialist, and undergo lysis of surgical adhesions to obtain better range of motion. Dr. Furr opined that at this point, Plaintiff's permanent partial disability rating would be higher without the lysis due to her loss of flexion. Dr. Furr also noted that he would see Plaintiff periodically to make sure she continued to improve.
15. At his deposition, Dr. Ginn agreed that December 2007 was the last time he saw Plaintiff, and that he had not reviewed any of her x-rays or MRI's since that time. Dr. Ginn did not obtain a left hand MRI during his treatment of Plaintiff and agreed it was possible that a left hand MRI would have changed his diagnosis and treatment plan for her. Further, Dr. Ginn testified that because Dr. Furr performed an osteotomy on Plaintiff and visualized the bone, he *Page 8 
would not question Dr. Furr's finding that Plaintiff had a partially mal-rotated left fifth metacarpal. Dr. Ginn was of the opinion that if Plaintiff had additional surgery subsequent to his treatment of her, then maximum medical improvement would not have occurred until after this subsequent surgery.
16. At his deposition, Dr. Baker recalled that his April 15, 2008 office visit with Plaintiff probably would have been a 15-minute encounter. He was unaware of Plaintiff's subsequent course of treatment with respect to her left hand/finger after April 15, 2008.
17. At his deposition on July 7, 2009, Dr. Furr opined that Plaintiff's August 28, 2007 work injury was the cause of the left hand/finger condition that he treated. Dr. Furr was also of the opinion that the June 10, 2008 left hand MRI indicated that there was an angulation deformity in the distal aspect of Plaintiff's left fifth metacarpal. According to Dr. Furr, Plaintiff's two options were to either live with the pain and the angulation of her left fifth metacarpal or try to correct it with surgery. Dr. Furr opined that the surgery option was medically appropriate and that a failure to perform the surgery would result in Plaintiff having to live with diminished hand function and pain, especially when she attempted to grip things. He further opined that Plaintiff could not perform activities involving repetitive use of her left hand, or requiring climbing or holding onto anything and further treatment and evaluation was reasonably required before assigning Plaintiff a permanent partial disability rating.
18. The Full Commission gives greater weight to the opinion testimony of Dr. Furr over any contrary opinions of Dr. Ginn and Dr. Baker. Although Dr. Ginn and Dr. Baker do have a particular expertise in hand surgery, the care that they provided is more remote in time compared to that of Dr. Furr, and they did not provide care over as long of a time period as Dr. Furr. Additionally, neither Dr. Ginn nor Dr. Baker had the benefit of visualizing Plaintiff's left *Page 9 
hand/finger in a surgical setting, which allowed an internal examination of the deformity affecting it, rather than just a radiological image. Dr. Ginn testified that he would not question Dr. Furr's surgical findings, and Dr. Baker acknowledged that reasonable medical minds could differ on appropriate treatment options for Plaintiff.
19. Defendants retained the services of Mr. Lee Anzaldi, a vocational rehabilitation counselor, to provide a transferable skills analysis to help identify potential occupations in a local labor market by utilizing plaintiff's work history, education, physical limitations and restrictions to identify occupations that would fit within these categories. A list of information is input into a computer program and a report is generated listing occupations where the information provided is transferable to actual job titles from the Dictionary of Occupational Titles.
20. Mr. Anzaldi understood and used as the basis for his transferable skills analysis that plaintiff had a high school diploma and some limited college and that her work history consisted of a job as a habilitation aide and a manager trainee. With respect to physical limitations, he understood that Plaintiff has a fractured left "pinky finger" and had permanent work restrictions of no lifting, pushing or pulling of more than 20 pounds with the left hand. The information he used was provided by Travelers Insurance. He made no independent efforts to verify the accuracy of the information.
21. The directly transferable occupations that Mr. Anzaldi identified included dental assistant, medical assistant, management training, children's tutor, childcare leader, a companion, playroom attendant and resident supervisor. These were general occupations and not specific jobs. Mr. Anzaldi did not perform a labor market survey in order to identify suitable employment available for Plaintiff. He did not identify whether the employment classifications *Page 10 
contained within his report are available in Plaintiff's hometown; he did not know where Plaintiff's hometown or county of residence is located, and did not know the unemployment rate in Plaintiff's hometown either at the time of deposition or at any time in the past. The transferable skills analysis lists skills for jobs in the occupation listed any where in the United States. The Full Commission gives little weight to Mr. Anzaldi's testimony on the issue of Plaintiff's disability.
22. Mr. Anzaldi was of the opinion that the occupations he identified are generally available in towns and cities in North Carolina.
23. The Full Commission finds, based upon the greater weight of the evidence that Plaintiff is not at maximum medical improvement with respect to her August 28, 2007 work injury.
24. The Full Commission further finds, based upon the greater weight of the evidence, that as of June 3, 2009, Plaintiff was capable of working in some capacity as Dr. Furr noted on this date that Plaintiff continued to make improvements with respect to her left hand/finger injury and released her from his care, other than to see her periodically to make sure she continued to improve. Although Plaintiff has permanent work restrictions with respect to her left hand/finger injury, she is capable of performing work within the restrictions given. The evidence does not establish that Plaintiff has made any attempts to obtain suitable employment since being released from the care of Dr. Furr or that searching for suitable employment would be futile. Plaintiff's testimony that Dr. Furr said she could not perform any duties is not corroborated by the medical records.
25. The Full Commission finds, based upon the greater weight of the evidence, that the treatment Plaintiff received from Dr. Furr has been medically necessary in order to effect a *Page 11 
cure, to give relief, and/or to lessen her period of disability. Plaintiff's testimony that that the surgery provided by Dr. Furr "helped a lot" is found to be credible. As a result of the treatment by Dr. Furr, Plaintiff can perform a number of activities of daily living that she could not perform before. The surgery also diminished her pain level. The osteotomy performed by Dr. Furr corrected the angulation of Plaintiff's left small finger, and also provided relief from the pain that she suffered. Other than the osteotomy and other treatment provided by Dr. Furr, Plaintiff's only other alternative was to live with the mis-angulation of her left small finger and the resulting pain.
26. The Full Commission further finds that the future treatment recommended by Dr. Furr, including, but not limited to the additional therapy, consultation with a hand specialist, and lysis of the surgical adhesions in order to obtain better range of motion, is reasonably necessary to effect a cure, give relief, and/or to lessen Plaintiff's period of disability with respect to her left hand/finger injury.
27. Plaintiff's average weekly wage is $476.60, resulting in a compensation rate of $317.75.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On August 28, 2007, Plaintiff sustained a compensable injury by accident arising out of and in the course of her employment with Defendant-Employer to her left hand/small finger. N.C. Gen. Stat. § 97-2(6). *Page 12 
2. Plaintiff is not at maximum medical improvement with respect to her August 28, 2007 work injury as further medical treatment is reasonably required. N.C. Gen. Stat. § 97-25.
3. As a result of Plaintiff's August 28, 2007 work injury, Plaintiff is entitled to have Defendants pay for all medical treatment reasonably related to this work injury. The medical treatment Plaintiff received for her left hand/finger injury from Dr. William Stephen Furr was reasonably required to effect a cure, provide relief, or lessen her period of disability and should be authorized. The issue of authorization has been timely raised before the Industrial Commission. The osteotomy performed by Dr. Furr corrected the angulation of Plaintiff's left small finger, and also provided relief from the pain that she suffered. Other than the osteotomy and other treatment provided by Dr. Furr, Plaintiff's only other alternative was to live with the mis-angulation of her left small finger and the resulting pain. N.C. Gen Stat. § 97-25.
4. The future treatment recommended by Dr. Furr, including, but not limited to the additional therapy, consultation with a hand specialist, and lysis of the surgical adhesions in order to obtain better range of motion, is also reasonably necessary in order to continue to effect a cure, to give relief, and/or to lessen Plaintiff's period of disability with respect to her left hand/finger injury. N.C. Gen. Stat. §§ 97-2(19), 97-25, 97-25.1
5. Dr. Furr is hereby designated as Plaintiff's authorized treating physician and the past medical treatment he provided to Plaintiff and the future treatment he has recommended for her August 28, 2007 work injury are also authorized. N.C. Gen. Stat. § 97-25 (2009).
6. Plaintiff is entitled to temporary total disability compensation at the rate of $317.75 per week from October 25, 2007 through June 3, 2009. As of June 3, 2009, Plaintiff's total temporary disability compensation is suspended as Plaintiff was capable of performing some work. Dr. Furr noted on this date that Plaintiff continued to make improvements with *Page 13 
respect to her left hand/finger injury, and released her from his care, other than to see her periodically to make sure that she continues to improve. Although Plaintiff has work restrictions with respect to her left hand/finger, Plaintiff has not proven that any effort on her part to search for suitable employment would be futile or that she made any attempts to obtain suitable employment. N.C. Gen. Stat. § 97-29 (2009); Russell v. Lowes Prod.Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, Defendants shall pay temporary total disability compensation to Plaintiff at the rate of $317.75 per week from October 25, 2007 through June 3, 2009. Defendants shall receive a credit for any overpayment of temporary total disability compensation to Plaintiff.
2. Dr. Furr is approved as Plaintiff's authorized treating physician.
3. Defendants shall pay all medical expenses incurred as a result of Plaintiff's August 28, 2007 work injury, including, but not limited to the treatment provided by Dr. William Stephen Furr and any future treatment recommended by him, for so long as such evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen her period of disability, in accordance with the provisions of the North Carolina Workers' Compensation Act.
4. A reasonable attorney's fee of 25 percent of the compensation due Plaintiff under paragraph one is approved for Plaintiff's counsel. *Page 14 
5. Either party may file a Form 33 in order to address Plaintiff's entitlement to further disability compensation upon Dr. Furr's finding that Plaintiff is at maximum medical improvement or upon Plaintiff's proof of entitlement to total or partial disability after the closing of this record.
6. Defendants shall pay the costs of these proceedings.
This the ___ day of June 2010.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1